UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MELISSA J. HARRIS,

        Plaintiff,

     v.                         Case No. 19-cv-441-pp

CITY OF MILWAUKEE,
CHIEF ALFONSO MORALES,
DETECTIVE KIMBERLY ANDERSON,
and KEYONA VINES,

        Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 33) AND DISMISSING CASE WITH PREJUDICE**

---

On March 27, 2019, the plaintiff, representing herself, filed a lawsuit alleging violations of her constitutional rights under 42 U.S.C. §1983. Dkt. No. 1. On September 30, 2020, the defendants filed a motion for summary judgment. Dkt. No. 33. This order grants that motion and dismisses the case with prejudice.

**I.     Procedural History**

The court received the plaintiff's original complaint on March 27, 2019. Dkt. No. 1. That complaint sued the City of Milwaukee, then-Chief Alfonso Morales of the Milwaukee Police Department and Detective Kimberly Anderson. Id. at 1. It alleged that on April 18, 2018, Chief Morales and Det. Anderson unlawfully arrested the plaintiff in her own property, falsely alleging that she had smoked marijuana with the students at the school where she worked, that

1

the police stated that she had "asked them to have sex with" her son's father and that she was arrested without a warrant. Id. at 2-3. The plaintiff said the police told her that they had a "body want" for her, a term with which she was not familiar; she stated she was kept in custody for five days. Id. at 3. She stated that she never was convicted. Id.

Although the plaintiff was representing herself, she paid the $400 civil filing fee, so the court did not "screen" the complaint. Defendants City of Milwaukee and Chief Morales answered on May 28, 2019, dkt. no. 7; on July 3, 2019, the court issued an order to show cause why the plaintiff had not served Det. Anderson, dkt. no. 9. The plaintiff complied with the order to show cause, dkt. no. 10, the court extended the deadline for the plaintiff to serve Anderson, dkt. no. 11, and the plaintiff served Anderson on August 9, 2019, dkt. no. 12. Anderson answered on October 7, 2019. Dkt. No. 14.

The parties filed their Rule 26(f) plan on October 31, 2019. Dkt. No. 18. Based on that plan, the court issued a scheduling order; that order set a deadline of November 30, 2019 for filing amended pleadings. Dkt. No. 20. On December 3, 2019, the court received from the plaintiff a request to extend that deadline, dkt. no. 21; the motion was accompanied by an amended complaint, dkt. no. 22. Before the court had a chance to rule on the motion to extend the deadline, the defendants filed their answer to the amended complaint. Dkt. Nos. 23, 26.

The amended complaint named as defendants the City of Milwaukee, Chief Morales, Anderson and Keyona Vines. Dkt. No. 22 at 1. The amended

complaint contained less detail than the original; the plaintiff reiterated that the "defendant officers" arrested her at around 4:00 p.m. on April 18, 2018 in her home. Id. at ¶7. She asserted that at the time of her arrest, she was not violating any laws, the police were not in hot pursuit, there was no information indicating that anyone in her home was in danger or destroying evidence, that the officers did not have probable cause to arrest her and that they did not have a warrant. Id. at ¶¶8-11. The plaintiff alleged that the officers took her to the "District 1 station" where she was detained for "at least 24 hours." Id. at ¶14. She said Chief Morales then had her taken to the Milwaukee County Jail, where she was held three more days without charges. Id. at ¶15. She asserted that she never saw a judge and never was charged with a crime. Id. at ¶¶16-17. Finally, the plaintiff alleged that the defendants kept her cell phone for approximately sixteen months. Id. at ¶18. The amended complaint contained three claims: (1) false arrest, (2) unlawful search and (3) as to the City of Milwaukee only, "Respondeat Superior and Indemnification." Dkt. No. 22 at 3-4.

The deadline for filing dispositive motions was June 30, 2020. Dkt. No. 20. On September 30, 2020, the defendants filed the instant motion for summary judgment. Dkt. No. 33. As required by this court's Civil Local Rule 56(a) (E.D. Wis.), the defendants' motion cited and reproduced Civil L.R. 56, id. at 2-4, Federal Rule of Civil Procedure 56(c)-(e), id. at 5-6, and Civil L.R. 7, id. at 6-8. Included in those materials was Civil L.R. 56(b)(1)(C), which requires the party who files the motion for summary judgment to include "a statement of

proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Dkt. No. 33 at 3. Also included was Civil L.R. 56(b)(2), which requires the party opposing such a motion to file

> a concise response to the moving party's statement of facts that must contain (i) a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon and (ii) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, declarations, parts of the record, and other supporting materials relied upon to support the facts described in that paragraph. A non-moving party may not file more than 100 separately numbered statements of additional facts.

Id. The defendants filed with their motion a brief (dkt. no. 34), their proposed findings of fact (dkt. no. 35), four declarations (dkt. nos. 36-39) and six exhibits (dkt. no. 39-1 through 39-6).

Under Civil L.R. 56(b)(2), the plaintiff's materials in opposition to the motion for summary judgment were due by October 30, 2020. Two days before that deadline, the court received from the plaintiff a motion for an extension of time to respond to the motion for summary judgment. Dkt. No. 41. She explained that she could not meet the deadline because she was struggling to pay bills and to complete some educational testing that would improve her chances of employment. Id. The court granted that motion, giving the plaintiff a new deadline of December 31, 2020 by which to file her opposition materials. Dkt. No. 42. On December 30, 2020—the day before the deadline—the court received from the plaintiff another motion for an extension of time to file her

4

opposition materials. Dkt. No. 43. The plaintiff stated that while she was close to being able to file her response, she had been unable to get to the computer she had been using at the Milwaukee Public Library because (a) computer use was limited to two hours and (b) because of COVID-19, she often was denied access for any period. Id. at 1-2. She also reported that she continued to be unemployed, that she was caring for her six-year-old son who was attending school virtually and that she did not have a working vehicle. Id. at 2. At the end of this motion, the plaintiff stated that she had "added the names of several officers whose true names became known to [her] only after the discovery was given over by the City." Id. The court granted the request for additional time and extended the deadline to January 31, 2021. Dkt. No. 44.

On January 29, 2021, instead of opposition materials to the defendants' motion for summary judgment, the court received from the plaintiff a document titled "2nd Amended Complaint," dkt. no. 45, and a "Declaration of Melissa J. Harris in Support of Second Amendmended [sic] Complaint," dkt. no. 46. The document titled "2nd Amended Complaint" appeared to name several defendants not named in the amended complaint; the caption named three new defendants (one of whom was *counsel* for the defendants), and the body of the document talked about five people not named in the amended complaint (but did not mention counsel). Dkt. No. 45.

A week later, the defendants filed a motion to strike the purported second amended complaint. Dkt. No. 47. On February 23, 2021, the court granted that motion. Dkt. No. 48. In its order, the court noted that the plaintiff

5

had missed the deadline for filing an amended complaint as a matter of course, already had filed one amended complaint with the court's leave and had failed to respond to the defendants' motion for summary judgment. Id. at 3-4. To the court, "[i]t appear[ed] that the plaintiff filed the 2nd Amended Complaint to try to address—perhaps even get around"—the defendants' summary judgment arguments. Id. at 4. The court found that it "border[ed] on abuse of the litigation process for a plaintiff to file a complaint and an amended complaint, wait until discovery ha[d] closed and the defendants ha[d] filed their motion for summary judgment and then try to change the litigation landscape by filing a second amended complaint that attempts to address the deficiencies the defendants pointed out in their motion." Id. at 5.

Although it struck the plaintiff's "2nd Amended Complaint," the court emphasized that the plaintiff had a "right to respond to the defendants' summary judgment arguments," explaining that "the appropriate way to do that is for her to file a brief in opposition to their motion, accompanied by her responses—paragraph by paragraph—to the defendants' proposed findings of fact." Id. The court noted that "failure to do so [would] result in the court deeming unopposed facts admitted." Id. (citing Fed. R. Civ. P. 56(e)(2), Civil L. R. 56(b)(4)). The court stated that if, during discovery, the plaintiff had collected evidence "that she believe[d] support[ed] her version of events, she must cite to that evidence, Fed. R. Civ. P. 56(c)(1), and if the evidence is not in the court record, she must attach the evidence as an exhibit to her opposition brief." Id. at 5-6. The order explained that in the alternative, the plaintiff

6

"[might] file a declaration—like the one she filed with the 2nd Amended Complaint." Id. at 6. The court gave the plaintiff "a final chance to oppose the defendant's motion for summary judgment and to explain to the court why she believes the court should not grant that motion." Id. It stressed, however, that "[i]f the plaintiff does not file an opposition brief and response to the defendants' proposed findings of fact by [March 19, 2021], *the court will consider the defendants' summary judgment motion unopposed and may grant judgment in their favor and dismiss the case.*" Id. (citing Fed. R. Civ. P. 56(e)(3)) (emphasis added).

On March 19, 2021, the plaintiff filed a brief in opposition to the defendants' motion for summary judgment, dkt. no. 49, and an "Affidavit of Melissa J. Harris in Opposition to Summary Judgment," dkt. no. 50. She did *not* file a response to the defendants' proposed findings of fact that reproduced each numbered paragraph in the defendant's statement of proposed facts as required by Civil L.R. 56(b)(2)(B)(i). In her opposition brief, however, the plaintiff asserted that she "file[d] a declaration along with [her] 2nd Amended Complaint," and argued that "[t]hat declaration is just as much evidence as the ones submitted by the officers." Dkt. No. 49 at 6. She insisted that the facts in her affidavit "must be considered by the court before it rules against me and allows this injustice to continue." Id.

The defendants filed their reply brief in support of the motion for summary judgment on April 2, 2021. Dkt. No. 51.

7

## II.    Facts

The plaintiff chose to file this lawsuit herself, without counsel. Although the case has been pending for two and a half years, the plaintiff never obtained counsel. While the court understands that non-lawyers likely are not as familiar with the court's rules and procedures as lawyers, the plaintiff received notice—multiple times—that she needed to respond to the defendants' proposed findings of fact in a particular way and that she needed to submit her own proposed findings of fact in a particular way. In its order striking the plaintiff's second amended complaint, the court make clear to the plaintiff that if she did not follow the procedure required by Civil L.R. 56, the court could deem any uncontested facts admitted.

"[A] court has discretion to enforce its local rules, even against a pro se litigant." Turner v. Cox, 569 F. App'x. 463, 467 (7th Cir. 2014) (citing McNeil v. United States, 508 U.S. 106, 113 (1993)). A court acts within its discretion when it accepts a defendant's proposed facts as true upon a plaintiff's failure to comply with local rules. Id. The plaintiff insists that she genuinely disputes several material facts, but even if the court were to accept her affidavit as complying with Civil L.R. 56, her responses either are completely lacking, are not supported by evidence or are not supported by admissible evidence. See Dkt. No. 50 at 2-8. The court deems the majority of the defendants' proposed findings of fact as admitted. See Fed. R. Civ. P. 56(c); Civil L.R. 56(b)(4). The

court takes the facts in this section from the defendant's proposed findings of fact, dkt. no. 35, to the extent that they find support in the record.

In April of 2018, the plaintiff worked as a substitute teacher at Carver Academy of Mathematics and Science School in Milwaukee, Wisconsin. Dkt. No. 35 at ¶¶1, 5. At the same time, B.K.E. was a fourteen-year-old black female student at the school, id. at ¶¶1-2; defendant Dawn Jones worked as a lieutenant of the Milwaukee Police Department, dkt. no. 36 at ¶4, defendant Keyona Vines was an officer with the Milwaukee Police Department, id. at ¶¶1-2, and defendant Kimberly Anderson was a detective with the Milwaukee Police Department, dkt. no. 37 at ¶¶1-2. On April 18, 2018, Lieutenant Jones directed Anderson and Vines to investigate an allegation of child enticement allegedly involving the plaintiff and B.K.E. Dkt. No. 35 at ¶1-2. Anderson and Vines interviewed B.K.E. at Sojourner Family Peace Center at 617 W. Walnut Street in Milwaukee. Id. at ¶4.

B.K.E. explained that on April 10, 2018, the plaintiff was her substitute teacher. Dkt. No. 35 at ¶5. B.K.E. told the officers that on that day, the plaintiff had invited her and two other two students from her class to come to the plaintiff's home daycare to clean it; B.K.E. said the plaintiff offered to pay each student $70. Dkt. No. 35 at ¶¶5-7. (Through photographs, B.K.E. identified the two other students. Dkt. No. 36 at ¶¶14-18; Dkt. No. 37 at ¶¶14-18.) The plaintiff told the students to meet her about two blocks away from the school at the end of the day. Dkt. No. 35 at ¶8. Around 3:55 p.m., B.K.E. and the other students walked the two blocks and were met by the plaintiff. Id. at ¶9. B.K.E.

9

described the "suspect's" car as "a newer, dark maroon vehicle with four doors and tinted windows. Dkt. No. 35 at ¶10. B.K.E. said that the plaintiff lived in the area of 22nd Street and West Center. Id. at ¶11. She said that when the group arrived at the residence, B.K.E. saw the plaintiff take a bag of marijuana from her pocket and leave it in the car. Id. at ¶12. Once they had arrived at the home, B.K.E. and the other students went in the house and began to clean the daycare. Id. at 14. B.K.E. described to the police the layout of the plaintiff's house and its furnishings. Id. at ¶15.

According to B.K.E., when she and the other students finished cleaning the daycare the plaintiff gave her perfume and a pair of pants; B.K.E. said she saw the plaintiff give one of the other students two hundred dollars after saying "thanks for last night." Id. at ¶¶16-17. The plaintiff then dropped all the girls off at home except the student who received two hundred dollars. Id. at ¶18. B.K.E. told police that she had been unhappy with the gifts the plaintiff had given her, that she wanted the $70 she believed the plaintiff owed her and that on April 13, 2018, she decided to send the plaintiff a text message because she wanted that money. Id. at ¶¶19-21. The plaintiff told B.K.E. "that she and the other girls made a good effort but only did half the work." Id. at ¶22.

The plaintiff was B.K.E.'s substitute teacher again on April 16, 2018; she asked B.K.E. whether she "wanted to make some money" and told her that her body was "so nice." Id. at ¶¶23-24. B.K.E. told police that she declined; later that afternoon, the plaintiff told B.K.E. to come to the daycare after school to get the payment for cleaning the daycare. Id. at ¶¶25-26. B.K.E. asked why she

10

had to go to the daycare to get the money, but later she agreed to go and the plaintiff again picked B.K.E. up after school at the location two blocks from the school. Id. at ¶¶27-28. The plaintiff came for B.K.E. in the same vehicle. Id. at ¶29. After picking up B.K.E., the plaintiff "picked up a black male, approximately age 35;" the plaintiff told him that B.K.E. wanted to make money. Id. at ¶¶30-31. B.K.E. "watched the man count out $700 . . . and remark that 'one of the hoes' stole $100 from him." Id. at ¶32.

Next, B.K.E. observed "an unknown Asian female, approximately age 16, and with a black eye enter the vehicle." Id. at ¶33. B.K.E. explained to the police that when the four arrived at the plaintiff's residence, the plaintiff brought B.K.E. into her bedroom. Id. at ¶34. The plaintiff "proceeded to smoke marijuana, drink Hennessey, and encourage B.K.E. to drink some, but B.K.E. refused." Id. at ¶35. The plaintiff offered B.K.E. various sums of money to perform various sexual acts; she offered B.K.E (1) five hundred dollars "for a 'threesome' with the plaintiff and the plaintiff's boyfriend, (2) seventy-five dollars "to place a sex toy inside of B.K.E.'s vagina," and (3) "prices for different sexual acts." Id. at 36-40. B.K.E. declined the offers, and "threatened to physically fight the plaintiff." Id. at ¶39. The plaintiff stated that "the 'hoes' upstairs would take their clothes off if she asked them because they knew where money came from." Id. at ¶41.

The plaintiff told B.K.E. that "the youngest girl who worked for her was 16 years old." Id. at ¶42. The plaintiff told police that this exchange frightened her and that she began texting her mother; she showed the officers the text

11

exchange. Id. at ¶¶43-44. B.K.E. wanted her mother to pick her up from the plaintiff's home. Id. at ¶45. B.K.E. left early because of how uncomfortable she felt and later was picked up by her godbrother near the plaintiff's home. Id. at ¶¶46-47.

B.K.E. informed Anderson and Vines that she had told her probation officer about her allegations after the April 16, 2018 incident. Id. at ¶49. On April 19, 2018, Officer Vines met with B.K.E.'s probation officer. Id. at ¶51. The probation officer "confirmed that B.K.E. told her the same thing she told Detective Anderson and Officer Vines." Id. at ¶52. "Between April 18 and April 20, the other two girls, their parents, B.K.E.'s mother, and the school principal were interviewed." Id. at ¶53. Multiple members of the Milwaukee Police Department participated in the initial investigation into B.K.E.'s claims. Id. at ¶54. On April 20, 2018, Lieutenant Jones "issued a 'Temporary Felony Want' for [the plaintiff] which is an interdepartmental warrant where probable cause exists to arrest a subject on an active investigation for a period of 72 hours." Id. at ¶55.

The Fugitive Apprehension Unit (FAU) locates and arrests suspects of felony offenses. Id. at ¶¶56-57. On April 21, 2018, Officers Rachel Goldbeck and Jose Viera of the Milwaukee Police Department worked on the FAU. Id. at ¶56; Dkt. No. 38 at ¶¶2-4. At the start of their shift, they received a list of wanted suspects that included the plaintiff. Dkt. No. 35 at ¶¶60-61. After confirming the presence of an active Temporary Felony Want for the plaintiff's arrest, the officers went to the plaintiff's home. Id. at ¶¶62-63. "A black male

12

later identified as the plaintiff's brother opened the door." <u>Id.</u> at ¶65. Officer Goldbeck indicated that "she was there to speak to the plaintiff about an incident at the plaintiff's child's daycare." <u>Id.</u> at ¶66. "When the plaintiff appeared, Officer Goldbeck apologized for mentioning the plaintiff's child and assured the plaintiff her child was fine." <u>Id.</u> at ¶67. "Officer Goldbeck explained to the plaintiff that she was being arrested." <u>Id.</u> at ¶68. When the plaintiff asked why, Officer Goldbeck "initially hesitated to explain further" due to the sensitive nature of the allegations. <u>Id.</u> at ¶69. "Officer Goldbeck did not want to cause embarrassment to the plaintiff because the plaintiff's brother and sister were inside of the residence." <u>Id.</u> at ¶70. "Officer Goldbeck then quietly explained the reason for the plaintiff's arrest." <u>Id.</u> at ¶71. After removing the plaintiff's cellphone from her hands and placing the plaintiff in handcuffs, Officer Goldbeck "placed the plaintiff's coat over her shoulders and escorted her to the squad vehicle." <u>Id.</u> at ¶¶72-73. On the way to the station, the plaintiff told the officers that "they were good officers" and "chatted happily" with them. <u>Id.</u> at ¶¶75-76. Officers recorded the entirety of the arrest on their body cameras, during which there was no mention of race. <u>Id.</u> at ¶¶78-79. While Officers Goldbeck and Viera arrested the plaintiff, "they were not involved in the underlying investigation." <u>Id.</u> at ¶80.

On March 27, 2019, the plaintiff filed a complaint alleging false arrest and a violation of her constitutional rights. <u>Id.</u> at ¶81. On December 9, 2019, the plaintiff filed an amended complaint. <u>Id.</u> at ¶82. Neither complaint named

13

the officers that arrested the plaintiff nor claimed that she was arrested because she is Black. Id. at ¶¶83-84.

On January 9, 2020, the plaintiff sat for the first of two recorded and transcribed depositions. Id. at ¶¶85-86. In the deposition, the plaintiff "continued to insist that the officers that arrested her were Detective Anderson and Officer Vines." Id. at ¶88. A month later, the plaintiff sat for her second deposition. Id. at ¶87. In that deposition, the plaintiff (1) "eventually admitted that she chose to name Detective Anderson and Officer Vines because those were the names she saw in a police report she received," id. at ¶89; (2) "accepted that the male officer that arrested her was Officer Viera," id. at ¶90; and (3) "acknowledged that the female officer that arrested her was Officer Goldbeck," id. at ¶91. The plaintiff maintained, however, that "Officer Goldbeck introduced herself as Detective Anderson even after watching Officers Goldbeck and Viera's Body Camera videos." Id. at ¶92. After viewing recordings of her arrest, the plaintiff declined to "withdraw her allegation that Officer Goldbeck specifically treated her poorly." Id. at ¶94. The defendants speculate that the plaintiff "appeared to believe the Body Camera videos were manipulated." Id. at ¶93. The plaintiff insisted that her arrest occurred without probable cause and because of her race. Id. at ¶¶95-96.[1]

---

[1] Although the court has not taken the facts from the plaintiff's affidavit filed in support of her opposition brief, the court notes that very little of the plaintiff's affidavit contradicts the facts asserted by the defendants. She says that she told the officers she did not want to go to jail without a warrant being presented. Dkt. No. 46 at ¶13. She says that when she began recording the incident, Goldbeck "snatched" her cellphone from her hands. Id. at ¶17. The

### III. Analysis

#### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

---

plaintiff says that Officer Viera "began briefly searching [her] home" while she was putting her shoes on. Id. at ¶22. She claims that she lost her job as a substitute teacher because of the arrest. Id. at ¶38. She alleges that she was denied unemployment benefits and did not find new work until January 2020. Id. at ¶¶44-45. Nothing in the affidavit addresses the defendants' proposed facts regarding why the officers went to the plaintiff's home and why they arrested her.

15

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

B.   Discussion

"To prevail on a § 1983 claim, the plaintiff must prove that '(1) [she] was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon [her] by a person or persons acting under color of state law.'" First Midwest Bank Guardian of Estate of LaPorta v. City of Chi., 988 F.3d 978, 986 (7th Cir. 2021) (quoting Buchanan-Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). "Individual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" Minix v. Canarecci, 597 F.3d 824, 834 (7th Cir. 2010) (quoting Palmer v. Marion Cty., 327 F.3d 588, 594 (7th Cir. 2003)).

16

1. *False Arrest*

The first cause of action in the amended complaint alleges that the "defendant officers" arrested the plaintiff without a warrant, probable cause or reasonable suspicion; that they wrongfully detained her and searched her "without any legal right to do so;" and that they did so "maliciously, willfully and wantonly, intentionally, and with reasonable certainty that the acts were in violation of the Plaintiff's constitutional rights and would cause harm to the Plaintiff." Dkt. No. 22 at ¶¶20-22. The plaintiff also asserts that the "defendant officers" did these things "in their official capacity as law enforcement officers, under color of state law, and acting within the scope of their employment." Id. at ¶21. She cites the Fourth and Fourteenth Amendments to the Constitution. Id. at ¶20.

The Seventh Circuit Court of Appeals has held that there is "a constitutional right not to be held in custody without probable cause." Manuel v. City of Joliet, Ill. (Manuel II), 903 F.3d 667, 670 (7th Cir. 2018). But

> "[p]robable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." *Stokes v. Board of Education of City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010), citing *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) (affirming summary judgment for defendant police officer). "Probable cause exists if, at the time of the arrest, the facts and circumstances within the defendant's knowledge 'are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense.'" *Id.*, quoting *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (reversing summary judgment for arresting officer.
>
> The probable-cause standard is objective and "relies on the common-sense judgment of the officers based on the totality of the circumstances." *Jackson v. Parker*, 627 F.3d 634, 638 (7th Cir.

2010), quoting *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). Probable cause "deals with probabilities and depends on the totality of the circumstances." [*District of Columbia v.*] *Wesby*, 138 S.Ct. [577,] at 586 [(2018)], quoting *Maryland v. Pringle*, 540 U.S. 366, 371 . . . (2003). Probable cause "is 'a fluid concept' that 'is not readily, or even usefully, reduced to a neat set of legal rules,'" *Id.*, quoting *Illinois v. Gates*, 462 U.S. 213, 232 . . . (1983). "It 'requires only a probability or a substantial chance of criminal activity, not an actual showing of such activity.'" *Id.*, quoting *Gates*, 462 U.S. at 243 . . . .

Muhammad v. Pearson, 900 F.3d 898, 907-908 (7th Cir. 2018). "The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigation." Beauchamp v. City of Noblesville, Ind., 320 F.3d 733, 743 (7th Cir. 2003) (collecting cases).

The officers who seized the plaintiff's phone, arrested and detained her in April 2018 had probable cause to do so. They had B.K.E.'s statement, which she'd made both to the police and to her probation officer. Police had interviewed the other two students, parents and the school principal before issuing the felony want. The fact that no charges were issued is not relevant— the question is whether, based on the totality of the circumstances, the information the officers had was sufficient to warrant a prudent person in believing that the plaintiff had committed a crime. It was. The information the officers had was sufficient to warrant a prudent person in believing that the plaintiff had attempted to commit or facilitate statutory rape and human trafficking.

18

The plaintiff finds it "shocking" that the defendants point to the fact that B.K.E. gave the same description of events to her probation officer that she gave to the Milwaukee police, and argues that that fact does not make B.K.E.'s story any more true. Again, the question is not whether B.K.E.'s story was true—the fact that she had told the same story to her probation officer was another circumstance under the totality of the circumstances warranting a prudent person to believe that the plaintiff had committed a crime.

In her opposition brief, the plaintiff asserts that the defendants' proposed facts are "false and added for [their] sensational quality." Dkt. No. 49 at 4. She says that the officers could have provided all this information to a judge and obtained a warrant for her arrest, but they did not do so. Id. She says, "Shockingly, the Motion actually notes that BKE told this same false story to her probation officer, as if this somehow verifies its truthfulness; rather than giving the police pause that this incredible witness story should in fact be brought to judge who might fairly weight that 'evidence' before allowing the police to arrest [the plaintiff]." Id.

Again, the question regarding probable cause is not whether B.K.E.'s story was true or false. It is whether, given the totality of the circumstances, the police had information to warrant their belief that the plaintiff had committed a crime. The fact that B.K.E.'s story later proved to be false (if it was), or that the investigation did not turn up sufficient evidence to allow the district attorney's office to bring a criminal charge, is not relevant to the

question of whether the defendants violated the plaintiff's Fourth Amendment rights by falsely arresting her.

The plaintiff argues that at the summary judgment stage, the court must believe her evidence and draw all justifiable inferences in her favor. Dkt. No. 49 at 6. But the only "evidence" the plaintiff has presented is her affidavit in opposition, most of which does not contradict the defendants' facts and much of which is legal argument rather than factual evidence. Dkt. No. 50.

The plaintiff asserts that she was arrested on a "temporary felony want," and takes issue with the defendants' description of this instrument as an "interdepartmental warrant." Dkt. No. 49 at 4-5 (presumably referring to Dkt. no. 38 at ¶19, in which Goldbeck describes a Temporary Felony Want as "an interdepartmental warrant where probable cause exists to arrest a subject on an active investigation for a period of 72 hours"). The plaintiff argues that by arresting her on a "felony want," "the Milwaukee Police intentionally misused the NCIC[2] system to avoid getting a warrant." Dkt. No. 49 at 2.

Whether the police came to the plaintiff's home in April 2018 because of a temporary felony "want" or a temporary "warrant" or had no arrest warrant at all, if they had probable cause at the time they arrested the plaintiff, that is an

_____

[2] "NCIC is 'an electronic clearinghouse of crime data that can be tapped into by virtually every criminal justice agency nationwide, 24 hours a day, 365 days a year.' *National Crime Information Center*, FBI, http://222.fbi.gov/about-us/cjis/ncic (last visited July 14, 2014). The FBI operates NCIC in conjunction with other federal, state, local, and tribal criminal justice entities. *Id.*" Wisconsin v. Subdiaz-Osorio, 357 Wis.2d 748, 755 n.10 (Wis. 2014).

absolute defense to a claim of false arrest. Because the admitted facts demonstrate that the officers who arrested the plaintiff in April 2018 had probable cause to believe that she had committed a crime, the defendants are entitled to summary judgment on the false arrest claim.

## 2. *False Search*

The second claim in the amended complaint is that the officers searched the plaintiff and her "phone car" without a search warrant and without probable cause. Dkt. No. 22 at 4. The admitted facts make no mention of a search, either of the plaintiff's person or of her phone. The plaintiff asserted in her affidavit that she was in the bath when the officers arrived at her home in April 2018 and that she didn't even have shoes on when she was arrested. Even accepting the plaintiff's version of the facts (despite their being presented in a procedurally improper manner), she did not allege that the officers searched her. As for her phone, the plaintiff alleges that the officers took it from her (and the defendants do not dispute that fact). But the plaintiff does not allege or demonstrate that the officers *searched* the phone. There are no facts—either from the plaintiff or the defendants—to support a Fourth Amendment unlawful search claim. The defendants are entitled to summary judgment on that claim.

## 3. *Respondeat Superior and Indemnification*

The final claim in the amended complaint alleges that under Wisconsin law, public entities must pay compensatory damages on tort judgments against employees who are acting within the scope of their employment. Dkt. No. 22 at

¶27. The plaintiff alleged that the defendant officers were acting in the scope of their employment when they arrested her, and therefore that the City of Milwaukee is "liable as a principal for all torts committed by its agents, Defendant Officers." <u>Id.</u> at ¶28.

The question of whether Wisconsin law requires public entities like the city to pay tort judgments awarded against employees who, when they committed the torts, were acting within the scope of their employment, has nothing to do with whether the defendants the plaintiff sued violated her civil rights. The last claim appears to be nothing more than an assertion by the plaintiff that if she prevailed on either of her substantive claims, she expected that the City would pay any damages.

Perhaps, by naming the City as a defendant and by arguing that the individual defendants were acting in their "official capacity as law enforcement officers," the plaintiff was trying to assert that the City was substantively liable for violating her civil rights. "Suits against employees in their official capacities are essentially suits against the government entities for which they work." <u>Gray v. Lacke</u>, 885 F.2d 399, 405 (7th Cir. 1989) (citations omitted). Section 1983— the civil rights statute under which the plaintiff brought the claims in the amended complaint—allows a plaintiff to sue any "person" who violates her civil rights while acting under color of state law. The City of Milwaukee is not a person. The Supreme Court has held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." <u>Monell v. Dep't of Soc. Serv's of City of New York</u>, 436 U.S. 658, 694 (1978). That does

22

not mean that a municipality never can be held liable under §1983. But it is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. To "succeed on a *Monell* [municipal liability] claim, a plaintiff must ultimately prove three elements: (1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." Hall v. City of Chi., 953 F.3d 945, 950 (7th Cir. 2020). The court already has determined that the amended complaint does not state a claim against the individual officers, and it does not allege that there was any official custom, policy, practice or procedure that violated the plaintiff's civil rights. To the extent that the plaintiff meant to assert a Monell claim against the City, the City is entitled to summary judgment.

The plaintiff also named Chief Alfonso Morales as a defendant, but the amended complaint does not allege that Morales was involved in the arrest in April of 2018. It appears that the plaintiff sued Morales only because he was the supervisor of the officers who arrested her.[3] "Section 1983 'does not allow

---

[3] The amended complaint says that Morales, "by virtue of the policies of the Milwaukee Police Department, had Plaintiff transported to the Milwaukee County Jail." Dkt. No. 22 at ¶15. The plaintiff does not appear to allege that Chief Morales himself knew she was at the District 1 police station and personally ordered that she be taken from that location to the Milwaukee County Jail.

actions against individuals merely for their supervisory role of others.' *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000)." <u>Doe v. Purdue University</u>, 928 F.3d 652, 664 (7th Cir. 2019). "To be liable, a supervisor 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.' *Zentmyer v. Kendall Cty., Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995))." <u>Id.</u> The amended complaint does not allege that Morales had any personal involvement in the alleged constitutional violations and Morales is entitled to summary judgment.

        4.    *Racially motivated arrest*

The amended complaint does not state the plaintiff's race, nor does it allege that the plaintiff believed that the officers arrested her because of her race. In their summary judgment motion, however, the defendants asserted that during her deposition, the plaintiff had stated that she was arrested because she is Black. Dkt. No. 34 at 15. In her opposition brief, the plaintiff stated, "I was arrested under these circumstances because I am a black woman without the benefit of legal counsel." Dkt. No. 49 at 3.

To survive summary judgment on a claim, a plaintiff must first *make* that claim. The way to make a claim is to state it in a complaint. Neither the original complaint nor the amended complaint mentioned the plaintiff's race or alleged that she was arrested because of her race. The first time the plaintiff made this allegation was in her brief in opposition to summary judgment, which she filed two years after filing this lawsuit. The plaintiff cannot survive summary judgment on a claim she did not bring.

24

### 5. *Qualified immunity*

The defendants contend that they are entitled to qualified immunity. Dkt. No. 34 at 17-18. "Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." Sutterfield v. City of Milwaukee, 751 F.3d 542, 572 (7th Cir. 2014). "To be 'clearly established,' a constitutional right 'must have a sufficiently clear foundation in then-existing precedent.'" Campbell v. Kallas, 936 F.3d 536, 545 (7th Cir. 2019) (quoting Wesby, 138 S. Ct. at 589). "Qualified immunity applies unless the specific contours of the right 'were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" Id. (quoting Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014)). Clearly established law "cannot be framed at a 'high level of generality.'" Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). Determining whether a state official is entitled to qualified immunity on a motion for summary judgment turns on whether the plaintiff has both "(1) alleged that the official committed acts violating a clearly established right and (2) adduced 'evidence sufficient to create a genuine issue as to whether the [official] in fact committed those acts.'" Balsewicz v. Pawlyk, 963 F.3d 650, 656 (7th Cir. 2020) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

For the same reasons the court has concluded that the individual defendants are entitled to summary judgment, it concludes that those defendants are entitled to qualified immunity. The plaintiff has not established

25

that the individual defendants committed acts clearly violating an established right, nor has she adduced evidence sufficient to create a genuine issue of material fact as to whether the individual defendants committed those acts.

**IV.    Conclusion**

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 33.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within thirty days of the entry of judgment. See Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within twenty-eight days of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 21st day of September, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**